**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FILED**

JUN 1 2 2009

Clerk, U.S. District and
Bankruptcy Courts

ALFRED H. SIEGEL, solely as Chapter 7
Trustee for IndyMac Bancorp Inc.,
15233 Ventura Blvd., 9th Floor
Sherman Oaks, CA  91403,

        Plaintiff,

    v.

FEDERAL DEPOSIT INSURANCE
CORPORATION,
550 17th Street, N.W.
Washington, DC 20429-9990,
in its capacity as Receiver for IndyMac
Bank, F.S.B., and in its corporate capacity,

        Defendant.

Civil Action No. _____

**JURY DEMAND**

Case: 1:09-cv-01088
Assigned To : Kennedy, Henry H.
Assign. Date : 6/12/2009
Description: General Civil

## COMPLAINT

    Plaintiff Alfred H. Siegel, as Chapter 7 Trustee for IndyMac Bancorp, Inc.

("Bancorp"), by his undersigned counsel, alleges as follows:

### PARTIES

    1.    Alfred H. Siegel ("Mr. Siegel" or the "Trustee") is Chapter 7 Trustee for

Bancorp in case no. 2:08-bk-21752-BB, currently pending in the United States

Bankruptcy Court for the Central District of California, Los Angeles Division (the

"Bankruptcy Case").

    2.    Bancorp is a corporation incorporated in the State of Delaware formerly

with its principal place of business at 888 E. Walnut Street, Pasadena, California 91101.

Prior to the Receivership Date and the Bankruptcy Petition Date (both as defined below),

Bancorp was a savings and loan holding company that indirectly owned IndyMac Bank, F.S.B. and IndyMac Bank, F.S.B.'s subsidiaries.

3.     IndyMac Bank, F.S.B. was a federal savings bank chartered pursuant to the Home Owners' Loan Act, 12 U.S.C. §§ 1461-70. IndyMac Federal Bank, F.S.B. was established subsequent to the FDIC's placing IndyMac Bank, F.S.B. into conservatorship. Throughout this Complaint, Plaintiff will refer to both IndyMac Bank, F.S.B. and IndyMac Federal Bank, F.S.B. as the "Bank."

4.     Defendant Federal Deposit Insurance Corporation ("FDIC") is the agency charged with, among other duties, administering the Federal Deposit Insurance Act and the federal bank deposit insurance system. The FDIC is sued in its corporate capacity ("FDIC-Corporate") and in its capacity as Receiver of IndyMac Bank, F.S.B. and as Receiver of IndyMac Federal Bank F.S.B. ("FDIC-Receiver"). In this Complaint, "FDIC" will be used to refer to FDIC-Corporate and FDIC-Receiver collectively.

## JURISDICTION AND VENUE

5.     This action arises under the United States Constitution and laws of the United States, including, without limitation, the United States Bankruptcy Code (the "Bankruptcy Code") and 11 U.S.C. §§ 101, *et seq.*, the Federal Deposit Insurance Act ("FDI Act").[1] This Court has jurisdiction over the subject matter of this action pursuant to 12 U.S.C. §§ 1819(b)(2)(A) and 1821(d)(6), and 28 U.S.C. §§ 1331 and 1334.

---

[1]     On February 24, 2009, the court in the Bankruptcy Case entered an *Order Approving Stipulation for Entry of Order Regarding Sale of FF&E and Reservation of Rights* [Bankr. Docket No. 261] (the "FF&E Order"). Under the FF&E Order, the FDIC, *inter alia*, shall indemnify and promptly reimburse the Bancorp estate in an amount equal to the value of the Bancorp estate's interest in certain physical property (consisting of furniture, fixtures and equipment, including, but not limited to, software, IT equipment, servers and storage systems) transferred as part of the sale of certain assets to IMB HoldCo LLC or its designee. By this Complaint, the Trustee does not bring, and hereby reserves, *inter alia*, any of the Bancorp estate claims described in the FF&E Order.

6.      Venue is proper in this Court under 12 U.S.C. § 1821(d)(6) and 28 U.S.C.
§ 1391(e).

## BACKGROUND

7.      On July 11, 2008, the Office of Thrift Supervision ("OTS") closed the
Bank.  The FDIC placed the Bank into federal conservatorship on July 17, 2008, seizing
control of the Bank's books, records and other papers, all of which were physically
maintained at the Bank.  Subsequently, the FDIC placed the Bank into receivership.

8.      On July 31, 2008 (the "Petition Date"), Bancorp filed a petition for relief
under Chapter 7 of the Bankruptcy Code.  On August 4, 2008, Mr. Siegel was appointed
interim Chapter 7 Trustee, and, on December 4, 2008, was appointed permanent Chapter
7 Trustee.

9.      Shortly after his appointment as Trustee, the Trustee learned that the FDIC
was in custody, control and possession of substantially all of Bancorp's books, records
and other papers.

## BANCORP'S EFFORTS TO OBTAIN INFORMATION FROM THE FDIC

10.     On September 10, 2008, the Trustee requested various documents and
other materials concerning Bancorp's financial information, including, but not limited to,
supporting detail for Bancorp's General Ledger for the period January 1, 2004 to July 4,
2008, detail regarding certain classes of Bancorp's assets, paid and unpaid invoices, bank
statements and underlying detail, and additional information regarding capital
contributions.

11.     On September 17, 2008, the Trustee supplemented his September 10, 2008
request by requesting additional materials.

12.     In late October 2008, the FDIC provided Trustee's counsel with access to a limited number of documents stored in two file rooms at the Bank's headquarters in Pasadena.  These materials included the Bancorp's Board materials (which was an item responsive to the September 2008 requests), files relating to regulatory matters, personal files for senior officers, a limited selection of work papers and audit reports from Ernst & Young, and corporate governance materials.

13.     In mid-December 2008, the FDIC provided Trustee's counsel with access to a limited number of documents responsive to the September 2008 requests, including, among others, the Bancorp's General Ledger for the period July 2007 to July 2008 with trial balances (in Excel format only), bank statements for all known Bancorp accounts, and documents related to the Bancorp's off-balance sheet assets.

14.     In January, 2009, the Trustee filed a motion under F.R.B.P. 2004 (the "2004 Motion") seeking additional documents and information related to the FDIC's sale of the Bank's assets (the "Sale Transaction").  The Bankruptcy Court granted the 2004 Motion that same month.

15.     In February and March of 2009, and again in early June 2009, the Trustee continued his efforts to obtain documents and information regarding Bancorp's finances, including the various downstream transfers addressed below.

16.     Despite the Trustee's diligent efforts described above and on-going discussions with the FDIC regarding providing the Trustee with access to this material, to date, much of the information the Trustee has requested remains outstanding. Accordingly, given that the Trustee has been unable to review adequately Bancorp's

books, records, and other papers or confer with all relevant employees, the Trustee has

prepared this Complaint based on the limited information available to him.

## BANCORP'S PROOF OF CLAIM

17.     On October 13, 2008, the Trustee served on the FDIC a timely Proof of

Claim asserting claims against the Receivership (each a "Claim") in compliance with

Section 11 of the FDI Act, 12 U.S.C. § 1821. A true and correct copy of the Proof of

Claim is attached hereto as Exhibit A.

18.     In the Proof of Claim, the Trustee sought an "undetermined amount in

excess of $754,437,000."

19.     The Statement of Proof of Claim attached to the Proof of Claim explains

that the Proof of Claim is based, at least in part, on the downstreaming of assets from

Bancorp to the Bank and on the FDIC's unilateral repudiation of the Tax Sharing

Agreement.

20.     The Statement of Proof of Claim further explains that the Trustee

"reserve[s] [his] right to bring additional claims based upon information that the FDIC

currently has not shared" with the Trustee, "in light of the lack of access to books and

records and personnel that are currently in the custody and control of the FDIC." The

Trustee further explains that he reserves the right "to amend this [Proof of Claim] to

conform to proof and to assert additional damages and liabilities."

## THE FDIC'S DISALLOWANCE OF THE TRUSTEE'S PROOF OF CLAIM

21.     On April 12, 2009, just before the expiration of the 180-day period during

which the FDIC was required by the FDI Act to determine whether to allow or disallow

the Trustee's proof of claim, *see* 12 U.S.C. § 1821(d)(4)(A)(1), the FDIC requested a 30-

day extension to respond to the Trustee's Proof of Claim. The Trustee agreed to the FDIC's request for a 30-day extension.

22.     The very next day, April 13, 2009, the FDIC sent the Trustee a letter (the "FDIC Response") indicating that it had determined to disallow the Trustee's claim.[2] The FDIC provided only a terse, one-sentence reason for the disallowance: "The facts and amount of damages, if any, are in dispute and therefore were not fixed and certain as of bank failure on July 11, 2008." This response is surprising given the FDIC's continuing failure to provide the Trustee with the books, records and information requested repeatedly by the Trustee, particularly since the Trustee stated repeatedly in the Statement of Proof of Claim that the FDIC's continuing failure to provide the Trustee with the requested documents and information has prevented the Trustee from evaluating any and all claims Bancorp may have against the Bank and the FDIC.

23.     Section 11 of the FDI Act provides that the Trustee may "request administrative review" of the Proof of Claim or may file suit in federal district court. 12 U.S.C. § 1821(d)(6)(A). On information and belief, the FDIC does not provide a mechanism for requesting administrative review of a Proof of Claim. Indeed, the FDIC's Response does not set forth any administrative review process, stating only that the Trustee has the right to file a lawsuit on the Proof of Claim in federal district court.

### DOWNSTREAM TRANSFERS

24.     Notwithstanding the FDIC's failure to provide all of the information and documents requested by the Trustee, the Trustee has learned that Bancorp transferred substantial funds downstream to Bank. From 2006 to 2008, the Trustee has learned that

---

[2]     A true and correct copy of the FDIC's Letter is attached hereto as Exhibit B.

Bancorp downstreamed to the Bank at least $736,437,000 (the "Identified Transfers"). The Trustee is informed and believes and hereby alleges that there may be additional transfers from 2006 to 2008 to or for the benefit of the Bank and/or its direct and indirect subsidiaries that the Trustee has been unable to discover due to FDIC's failure to provide the Trustee with the information he has requested (together, with the Identified Transfers, the "Downstream Transfers").

25.     On information and belief, on the dates these Downstream Transfers were made, Bancorp: (i) was insolvent or rendered insolvent as a result of these transfers; and/or (ii) was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining with Bancorp was an unreasonably small capital. Many of the Downstream Transfers were in violation of Bancorp's policies.

26.     Indeed, Bancorp's pattern of making downstream transfers in violation of its own policies began before 2006. A memorandum from Bancorp's Treasurer to Bancorp's Board dated January 11, 2006, states that Bancorp's downstream transfers in the fourth quarter of 2005 violated Bancorp's internal minimum liquidity policy and left Bancorp nearly 4% below Bancorp's requirement that it maintain liquid assets at least equal to twelve months of projected cash outflows on stock dividends and interest payments on unsecured debt.

27.     In 2006, Bancorp downstreamed at least $354,127,000 to the Bank. Specifically, Bancorp downstreamed $20,000,000 on March 31, 2006, $117,900,000 on June 30, 2006, $136,227,000 on September 30, 2006, and $80,000,000 at or around the close of the fourth quarter of 2006.

28.     On information and belief, some or all of the downstream transfers during 2006 occurred because of Bancorp's concern to maintain certain risk-based capital ratios with respect to the Bank, irrespective of Bancorp's own capital needs and financial condition.

29.     In 2007, Bancorp downstreamed at least $260,000,000 to the Bank, $25,000,000 at or around the close of the first quarter of 2007; $175,000,000 at or around the close of the third quarter of 2007; and $60,000,000 at or around the close of the fourth quarter of 2007.

30.     On information and belief, some or all of the Downstream Transfers during 2007 occurred because of Bancorp's concern to maintain certain risk-based capital ratios with respect to the Bank, irrespective of Bancorp's own capital needs and financial condition.  During 2007 and despite such capital contributions, senior management at both Bancorp and the Bank acknowledged significant concerns about the Bank's liquidity and capitalization.  Senior management also expressed a lack of confidence in the Bank's profitability, acknowledging that Bancorp's stock price was declining and that the Bank needed to cut operating costs.

31.     Further, senior management recognized the importance of raising sufficient capital to ensure survivability, acknowledged the possibility of a run on the Bank and even began discussing the possibility of selling the entire company. Concurrent with its serious concerns and significant capital support of the Bank, senior management, on information and belief, was overly optimistic in its forecasts and profitability projections, disregarding or seriously underestimating, for example, significant market and credit risks to the detriment of both Bancorp and the Bank.

32.     In 2008, Bancorp downstreamed at least $122,310,000 to the Bank, despite the fact that the collapse of Bancorp and the Bank was increasingly probable and despite senior management's recognition that making further capital contributions would deplete Bancorp's cash reserves. The continuing deteriorating financial condition of Bancorp and the Bank was undeniable. Senior management again recognized the very real risk of a run on the Bank as well as the necessity of selling the company or finding further financing.

33.     Specifically, and despite such concerns, Bancorp downstreamed $72,310,000 to the Bank at or around the close of the first quarter of 2008, and downstreamed $50,000,000 on May 9, 2008 ($18,000,000 of which was backdated to March 31, 2008 from May 9, 2008).

34.     On information and belief, Bancorp received less than a reasonably equivalent value and less than fair consideration in exchange for each of the Downstream Transfers alleged herein. Indeed, Bancorp received no consideration for most, if not all, of the Downstream Transfers.

## TAX REFUNDS

35.     On February 6, 2003, Bancorp and the Bank entered into the Amended and Restated Tax Sharing Agreement ("Tax Sharing Agreement").

36.     On information and belief, Bancorp filed federal, state and local consolidated tax returns on behalf of itself and its subsidiaries—including the Bank—for the 2002, 2003, 2004, 2005 and 2006 tax years.

37. In a letter dated August 15, 2008, without seeking or obtaining relief from the automatic stay in effect in the Bankruptcy Case under 11 U.S.C. § 362, the FDIC purported to repudiate the Tax Sharing Agreement.

38. The FDIC thereupon filed a 2007 federal tax return on behalf of the Bank and its subsidiaries on or around September 15, 2008. The FDIC also filed an amended federal tax return for 2005.

39. The Trustee, on behalf of Bancorp, filed a 2007 consolidated federal tax return on September 15, 2008. Under this 2007 consolidated tax return, a refund in the amount of $2,228,386 is due, as well as a refund of $11,152,072 as a result of carrying back losses to the 2005 tax year. On information and belief, the IRS has sent the case to the Joint Committee for review and an additional $199,459 refund may be due for 2005.[3]

40. Had the FDIC not purported to repudiate the Tax Sharing Agreement, the Trustee could have preserved the Tax Sharing Agreement in the Bankruptcy Case by assuming it as provided by applicable law.

41. On information and belief, Bancorp is entitled to some or all refunds on behalf of itself and its subsidiaries, including the Bank, relating to some or all of the federal, state and local consolidated tax returns filed for tax years 2002 through 2007, as well as for any refunds due for previous years.

42. Bancorp, as payor of the consolidated tax returns, is entitled to receive all refunds associated with the federal, state and local consolidated tax returns. For example,

---

[3]  Additional refunds may be due under the separate, combined or consolidated state tax returns for several states in which Bancorp or its subsidiaries operated. Bancorp asserts its right to those amounts as well and reserves its right to amend this Complaint to state those amounts more specifically.

under Treasury Regulation 1.1502-77(a), Bancorp, as the common parent of the consolidated group that includes the Bank, generally has the authority to act as the sole agent for the subsidiary members of the group with respect to all matters relating to the tax liability of the consolidated group. Pursuant to this authority, Bancorp may file claims for refund. And, any such refunds claimed in accordance with such authority are to be paid directly to Bancorp.

43.     The Internal Revenue Service ("IRS") has filed several Proofs of Claim in the Bankruptcy Case, the most recent of which asserts claims as of the Petition Date of $35,092,921.44 with respect to unassessed tax liabilities stemming from the 2004, 2005, 2007, and 2008 tax periods.

44.     Upon information and belief, the claimed unassessed tax liabilities from 2004, which amount to $1,057,706 of the unsecured priority claims, relate to the IRS' ongoing audit of certain aspects of the 2004 consolidated federal tax return.

45.     To the extent the Bank is entitled to any portion of the above-referenced refunds, notwithstanding the Trustee's position set forth herein, any amounts owed to the Bank from the refunds must be used to offset or recoup (1) any amounts owed to the IRS stemming from the IRS' proof of claim filed in the Bankruptcy Case or other claims that it may assert against Bancorp that are based upon the Bank's separate tax liability, as well as (2) any other adjustments that Bancorp may determine need to be made to the income, gain, losses, deductions or credits with respect to other tax years for which Bancorp filed consolidated tax returns on behalf of the Bank.

## CLAIMS FOR RELIEF

### Count I

### Avoidance of Fraudulent Transfers under 11 U.S.C. § 548

46.     The Trustee repeats and realleges each allegation in this Complaint as if fully set forth herein.

47.     Certain of the Downstream Transfers identified above (or via amendment), and possibly additional transfers to or for the benefit of the Bank and/or its direct and indirect subsidiaries the Trustee has been unable to discover due to FDIC's failure to provide the Trustee with the information he has requested, occurred within two years of the Petition Date.

48.     Bancorp received less than a reasonably equivalent value in exchange for the Downstream Transfers.  Indeed, on information and belief, Bancorp received no consideration whatsoever for most if not all of the Downstream Transfers.

49.     On information and belief, Bancorp on the dates these Downstream Transfers were made: (i) was insolvent or rendered insolvent as a result of these transfers; and/or (ii) was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining with Bancorp was an unreasonably small capital.

50.     As a result, the downstream transfers are avoidable fraudulent transfers under Section 548 of the Bankruptcy Code, 11 U.S.C. § 548.

### Count II

### Avoidance of Fraudulent Transfers under
### California Uniform Fraudulent Transfer Act, Cal. Civ. Code §§ 3439.01 *et seq.*

51.     The Trustee repeats and realleges each allegation in this Complaint as if fully set forth herein.

52.     The Downstream Transfers identified above (or via amendment), and possibly additional transfers to or for the benefit of the Bank and/or its direct and indirect subsidiaries the Trustee has been unable to discover due to FDIC's failure to provide the Trustee with the information he has requested, occurred within the time period pursuant to applicable non-bankruptcy law entitling the Trustee to avoid and recover such transfers.

53.     On information and belief, there is a creditor of the Debtor that holds an unsecured claim that is allowable under 11 U.S.C. § 502 and whose claim arose prior to each of the Downstream Transfers.

54.     Pursuant to 11 U.S.C. § 544(b), the Trustee may avoid any transfer of an interest of Bancorp in property or any obligation incurred by Bancorp that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502.

55.     Bancorp received less than a reasonably equivalent value in exchange for the Downstream Transfers.  Indeed, on information and belief, Bancorp received no consideration whatsoever for most if not all of the transfers.

56.     On information and belief, Bancorp on the dates these Downstream Transfers were made: (i) was insolvent or rendered insolvent as a result of these transfers; and/or (ii) was engaged in a business or transaction, or was about to engage in a business or transaction, for which any property remaining with Bancorp was an unreasonably small capital.

57.     As a result, the downstream transfers are avoidable fraudulent transfers under the California Uniform Fraudulent Transfer Act, Cal. Civil Code §§ 3439 *et seq.*

## Count III
### Avoidance of Preferential Transfers under 11 U.S.C. § 547

58.     The Trustee repeats and realleges each allegation in this Complaint as if fully set forth herein.

59.     On information and belief, the FDIC may contend that some of the Downstream Transfers set forth herein (or via amendment) and possibly additional transfers to or for the benefit of the Bank and/or its direct and indirect subsidiaries the Trustee has been unable to discover due to FDIC's failure to provide the Trustee with the information he has requested, were made on account of alleged debts owed by Bancorp to Bank.

60.     In the event that it is determined that any of the Downstream Transfers set forth herein were made on account of alleged debts owed by Bancorp to Bank and were made within one year of the Petition Date, they were made for or on account of antecedent indebtedness and at a time while Bancorp was insolvent and at a time that Bank was an insider of Bancorp for purposes of 11 U.S.C. § 101(31).

61.     As a result, the Downstream Transfers are avoidable preferential transfers under Section 547 of the Bankruptcy Code, 11 U.S.C. § 547.

## Count IV
### Declaration that Bancorp Is Entitled to Receive Tax Refunds

62.     The Trustee repeats and realleges each allegation in this Complaint as if fully set forth herein.

63.     An actual controversy has arisen between the Trustee and FDIC regarding the respective entitlements of the Trustee and the FDIC to receive refunds in connection

with the consolidated and combined tax returns filed by Bancorp for the years 2002 through 2007, as well as for any refunds for previous years.

64.     The Trustee contends that he, as the successor to Bancorp, is entitled to receive any and all refunds in connection with the Bancorp consolidated and combined tax returns for the years 2004 through 2007, as well as all refunds for any previous years, and that any legal right of the FDIC or the Bank to tax refunds is properly made, if at all, solely as general unsecured claims against the estate in the Bankruptcy Case.

65.     To the extent that the FDIC bases any claim to the tax refunds or defense to the Trustee's claims against, arising out of, deriving from or relating to actions in violation of the automatic stay of 11 U.S.C. § 362, such claims and defenses are not assertable and void as a matter of law.[4]

66.     The controversy is definite and concrete.

67.     The Trustee and FDIC have adverse interests.

68.     The controversy between the Trustee and FDIC is real and immediate.

69.     Therefore, the Court should declare that all refund payments be made to Bancorp.

## Count V
## Breach of Contract

70.     The Trustee repeats and realleges each allegation in this Complaint as if fully set forth herein.

---

[4]     This Complaint does not seek damages for violation of the automatic stay which may be sought by the Trustee in the Bankruptcy Court, which has exclusive jurisdiction thereof.

71.   Bancorp and the Bank were parties to a valid and enforceable Tax Sharing Agreement.

72.   Bancorp complied with the terms of the Tax Sharing Agreement.

73.   Without seeking or obtaining relief from the automatic stay in effect in the Bankruptcy Case under 11 U.S.C. § 362, the FDIC purported to repudiate the Tax Sharing Agreement.

74.   The FDIC has failed to perform as specified in the Tax Sharing Agreement.

75.   As a result of the FDIC's breach of the Tax Sharing Agreement, Bancorp suffered economic losses.

## Count VI
### Recovery of Avoidable Transfers

76.   The Trustee repeats and realleges each allegation in this Complaint as if fully set forth herein.

77.   The Trustee is authorized under Section 550 of the Bankruptcy Code, 11 U.S.C. § 550, to recover, for the benefit of the estate, all avoidable transfers or the value of such transfers, together with interest as permitted by law.

78.   By filing the Proof of Claim with the FDIC, the Trustee has attempted to exercise his authority under Section 550.

79.   The FDIC's disallowance of the Trustee's Proof of Claim compromises the Trustee's authority under Section 550.

80.   The FDIC should be required to comply with the Trustee's authority under Section 550.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests the Court to grant the following

relief:

1.  An order declaring the Downstream Transfers, and any other transfers, to or for the benefit of the Bank and/or its direct and indirect subsidiaries to be avoidable fraudulent transfers under 11 U.S.C. § 548;

2.  An order declaring the Downstream Transfers, and any other transfers, to or for the benefit of the Bank and/or its direct and indirect subsidiaries to be avoidable fraudulent transfers under Cal. Civ. Code §§ 3439.01 *et seq.*;

3.  An order declaring the Downstream Transfers, and any other transfers, to or for the benefit of the Bank and/or its direct and indirect subsidiaries to be avoidable fraudulent transfers under 11 U.S.C. § 547;

4.  An order declaring that all refunds in connection with federal, state and local consolidated tax returns filed by Bancorp be paid to Bancorp;

5.  An order awarding Bancorp damages for the FDIC's breach of the Tax Sharing Agreement;

6.  An order directing the FDIC to return all avoidable transfers, including, but not limited to, the Downstream Transfers, to Bancorp;

7.  An order awarding Bancorp costs and attorney's fees as may be permitted by law; and

8.  An order awarding Bancorp such other relief as may be just and equitable.

## DEMAND FOR JURY TRIAL

The Trustee, by and through his attorneys, hereby demands a trial by jury on all

claims otherwise triable by jury asserted in the Complaint.

Respectfully submitted,

Andrew L. Sandler  (DC Bar No. 387825)
Benjamin B. Klubes (DC Bar No. 428852)
Kirk D. Jensen (DC Bar No. 477629)
Benjamin P. Saul (DC Bar No. 482699)
BUCKLEYSANDLER LLP
1250 24th St., NW, Suite 700
Washington, DC 20037
(202) 349-8000 (Telephone)
(202) 349-8080 (Facsimile)

Special Counsel for Plaintiff Alfred H. Siegel,
solely as Chapter 7 Trustee for IndyMac Bancorp,
Inc.

Dated:  June 12, 2009

# Exhibit A

09 1088

**FILED**

JUN 1 2 2009

Clerk, U.S. District and
Bankruptcy Courts

**Federal Deposit Insurance Corporation as Receiver for:**

10007 – IndyMac Bank, F.S.B. Pasadena, CA

(Name of Bank/Financial Institution and Location)

## PROOF OF CLAIM

SSN/Tax ID # (1)  95-3983415

The undersigned, (2) Alfred H. Siegel

(Name of person making the claim)

says that the IndyMac Bank, F.S.B._____ now in liquidation is

(Name of Bank/Financial Institution)

justly indebted to (3) IndyMac Bancorp, Inc._____ in the sum of

(Individual/Joint/Corporation/Partnership/Firm/Agency)

(4) an undetermined amount in excess of $754,437,000_____ Dollars upon the following Claim:

| | Description of (invoice) claim: | Liability Number | Amount of Claim |
|---|---|---|---|
| C L A I M S | (5) Downstreaming of assets from IndyMac Bancorp to IndyMac Bank; repudiation of Tax Sharing Agreement (See Attached Statement of Proof of Claim) | 500006688-000 | undetermined amount in excess of $754,437,000. |
| | | Total Claim:(6) | |

The undersigned further states that he/she makes this claim on behalf of

(7) IndyMac Bancorp, Inc._____ ,

that no part of said debt has been paid, that

(8) IndyMac Bancorp, Inc._____

(Individual/Joint/Corporation/Partnership/Firm/Agency)

has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or

counterclaim, or other legal or equitable defense to said claim or any part thereof.

NAME (9)   _____   Chapter 7 Trustee

(Signature of Person making the Claim)           (Title)

FIRM   c/o Siegel, Gottlieb, Mangel & LeVine LLP

(if applicable)

ADDRESS (10)  15233 Ventura Blvd. 9th Floor

CITY/STATE/ZIP  Sherman Oaks, CA 91403-2201

TELEPHONE NUMBER   (818) 325-8441

The penalty for knowingly making or inviting reliance of any false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than thirty years, or both (18 U.S.C. Section 1007).

RLS7222

3

## Statement of Proof of Claim

This statement and the enclosed proof of claim form (collectively the "Proof of Claim") is submitted by Mr. Alfred H. Siegel ("Mr. Siegel" or the "Trustee") who serves as the interim Chapter 7 Trustee for IndyMac Bancorp, Inc. ("Bancorp") in Case No. 2:08-bk-21752-BB, currently pending in the United States Bankruptcy Court of the Central District of California, Los Angeles Division (the "Bankruptcy Case"). By filing this Proof of Claim, the Trustee is not consenting to relief from or modification of the automatic stay in effect in the Bankruptcy Case or waiving or modifying the exclusive jurisdiction of the United States Bankruptcy Court presiding over the Bankruptcy Case, including, without limitation, any rights of the Trustee to seek and obtain turnover of property in possession of the Federal Deposit Insurance Corporation ("FDIC"), assert rights as a lien creditor and as successor to certain creditors and purchasers, preserve any transfers avoided for the benefit of the estate, and object, to seek disallowance or subordination and to assert defenses, rights of offset or rights of recoupment in connection with any proofs of claim asserted by the FDIC or third parties in the Bankruptcy Case.

On July 11, 2008, the Office of Thrift Supervision ("OTS") closed IndyMac Bank, F.S.B., Pasadena, California (the "Bank"), and on July 17, 2008, the FDIC placed the Bank into federal conservatorship, seizing control of the Bank's books and records. On July 31, 2008, Bancorp filed a petition for relief under Chapter 7 of the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.) and on August 4, 2008, Mr. Siegel was duly appointed interim Chapter 7 Trustee.

Shortly after his appointment, the Trustee learned that the FDIC was in custody, control and possession of substantially all of Bancorp's books and records. Despite diligent efforts and ongoing discussions with the FDIC regarding providing the Trustee access to Bancorp's books and records, the Trustee has not yet been provided with access sufficient to permit an evaluation of them to determine any and all claims that the Trustee may have against the Bank and the FDIC. In addition, the Trustee's requests for access to Bancorp personnel now employed at the Bank are still the subject of discussion between the Trustee and the FDIC. Notably, the same lack of access to Bancorp's books and records and its personnel resulted in Bancorp's bankruptcy schedules being filed with "no assurance that these Schedules and Statements are complete and substantial errors or omissions may exist."

The claims included within this Proof of Claim arise from the Trustee's ability to avoid and recover constructive or actual fraudulent transfers, obligations and preferences under Sections 544, 547, 548 and 550 of the United States Bankruptcy Code as well as the Trustee's rights to pursue causes of action vesting in the bankruptcy estate under Section 541 of the United States Bankruptcy Code. Sections 548 and 550 enable the Trustee to avoid and recover certain obligations incurred or transfers made or incurred prior to the commencement of the Bankruptcy Case. While Section 548 allows the Trustee to avoid an obligation

1

incurred or a transfer made within two years prior to the commencement of the Bankruptcy Case, Section 544(b) allows the Trustee to use state law, namely the Uniform Fraudulent Conveyance Act ("UFCA") and the Uniform Fraudulent Transfer Act ("UFTA"), as applicable, to avoid and recover fraudulent obligations or transfers in addition to the avoidance rights afforded to the Trustee by Section 548. Both the UFCA and the UFTA generally have longer statutory reachback periods than Section 548, enabling the Trustee to avoid obligations and transfers made outside the two-year time frame permitted under Section 548. Section 550 of the United States Bankruptcy Code enables the Trustee to recover transfers, conveyances and obligations avoided under Section 544 or 548. Sections 547 and 550 of the United States Bankruptcy Code enable the Trustee to avoid and recover certain "preferential" transfers on account of antecedent indebtedness. Section 541 of the Untied States Bankruptcy Code vests in the bankruptcy estate causes of action which the Trustee may pursue on behalf of the bankruptcy estate in accordance with applicable law, including, by way of illustration only, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, negligence, breach of contract and other assorted actions.

As set forth above, because the Trustee has been unable to review adequately Bancorp's books and records or confer with Bancorp employees for purposes of filing this Proof of Claim, the Trustee is filing the Proof of Claim based on the limited information available to notify the FDIC of claims that the Trustee could pursue. Such claims are discussed in turn below.

The Trustee seeks to avoid and recover an undetermined amount believed to be in excess of $754,437,000 of Bancorp's assets transferred from Bancorp to the Bank until just prior to the Bank's failure on July 11, 2008. Additional transfers may have occurred to persons or entities other than the Bank but as to which the Bank was the primary beneficiary. Avoidable obligations may also have been incurred during the relevant period. Upon information and belief, and without limiting the foregoing, based on the information available to us at this time, such transfers or "downstreaming" may have been made and obligations incurred at a time when Bancorp and the Bank were, or were rendered, insolvent, undercapitalized, or unable to pay their debts as they became due such that Bancorp received either no value or less than reasonably equivalent or fair value for the transfers or obligations.

Moreover, Bancorp's claims may be based upon breaches of fiduciary duties owed by the directors and officers of the Bank to Bancorp and the liability of the Bank in connection therewith. Such directors and officers could have failed to act in the best interests of Bancorp including, but not limited to, by directing and/or accepting such downstreams and repeatedly failing to recognize red flags that the Bank was in financial trouble and eventually on the brink of failure.

Further, Bancorp's claims may be based upon payments made by or expenses charged to Bancorp that should have been paid by the Bank including, but not limited to, the payment of Bank employees' salaries; compensation-related fees or expenses; payments made under service and/or other contractual agreements entered into by the Bank; compensation to professionals and third parties; and payments under guarantees. Upon information and belief, Bancorp also incurred obligations that are avoidable under the above-cited provisions. These and other transfers and obligations may also have given rise to rights of action under Sections 544, 547, 548 and 550 of the United States Bankruptcy Code. In addition to causes of action arising under Sections 544, 547, 548 and 550 of the United States Bankruptcy Code, as noted above, the Trustee also may have claims with respect to Bank assets that are property of the bankruptcy estate under Section 541 of the United States Bankruptcy Code and that otherwise may be asserted by the Trustee, and such claims are hereby asserted and expressly preserved. Moreover, as discussed in greater detail below, the Trustee may have claims stemming from tax-related issues arising from consolidated tax returns filed by Bancorp on behalf of, among others, the Bank. Accordingly, the Trustee bases his claims under both the fraudulent conveyance, fraudulent transfer and preference provisions of the United States Bankruptcy Code and state statutory law, as well as state common law. Since the Trustee's investigation has only recently commenced, the Trustee expressly reserves its rights to assert and bring any action based upon the avoidance and recovery provisions of Chapter 5 of the United States Bankruptcy Code or other applicable law, whether or not specifically enumerated herein.

Without limiting the generality of the foregoing, the transfers listed below serve as examples of downstreaming assets from Bancorp to the Bank, eventually depleting Bancorp's assets to the detriment of the bankruptcy estate:

In 2006, a total of $354,127,000 was downstreamed from Bancorp to the Bank. Specifically, $274,127,000 was downstreamed as of September 30, 2006, $20,000,000 of which appears to have been downstreamed on March 31, 2006 and an unknown amount on June 30, 2006. Further, $136,227,000 was downstreamed on September 30, 2006 and $80,000,000 was downstreamed some time during the fourth quarter. Some or all of these downstreams appear to have occurred because of Bancorp's concern to maintain certain risk based capital ratios with respect to the Bank, irrespective of Bancorp's own capital needs.

In 2007, a total of $260,000,000 was downstreamed from Bancorp to the Bank. Specifically, $25,000,000 was downstreamed in the first quarter of 2007; $175,000,000 was downstreamed in the third quarter of 2007; and $60,000,000 was downstreamed in the fourth quarter of 2007. During this time period and despite such capital contributions, senior management at both Bancorp and the Bank acknowledged significant concerns about the Bank's liquidity and capitalization. Senior management also expressed a lack of

confidence in the Bank's profitability, acknowledging that Bancorp's stock price was declining and that it needed to cut operating costs. Further, senior management recognized the importance of raising sufficient capital to ensure survivability, acknowledged the possibility of a run on the Bank and even began discussing the possibility of selling the entire company. Concurrent with its serious concerns and significant capital support of the Bank, senior management may have been overly optimistic in its forecasts and profitability projections, potentially disregarding or seriously underestimating, for example, significant market and credit risks to the detriment of both Bancorp and the Bank.

In 2008, at least $140,310,000 was downstreamed from Bancorp to the Bank, despite the fact that the collapse of Bancorp and the Bank was increasingly probable and despite senior management's recognition that making further capital contributions would deplete Bancorp's cash reserves. The continuing deteriorating financial condition of Bancorp and the Bank was undeniable. Senior management again recognized the very real risk of a run on the Bank as well as the possibility of selling the company. Specifically, despite such concerns, Bancorp proceeded to downstream $70,000,000 on March 31, 2008, the majority of the total of $90,310,000 it transferred during the first quarter of 2008, and downstreamed approximately an additional $50,000,000 on or around May 9, 2008.

The Trustee also asserts claims based upon the FDIC's purported repudiation of the Amended and Restated Tax Sharing Agreement entered into on February 6, 2003 between the Bank and Bancorp (the "Tax Sharing Agreement"), as asserted in the FDIC's letter of August 15, 2008. The FDIC's repudiation of the Tax Sharing Agreement without first seeking relief from the automatic stay and occurred before the statutory deadline under section 365(d)(1) of the United States Bankruptcy Code for the Trustee to assume or reject executory contracts and unexpired leases, and as such, rendered it impossible for the Trustee to preserve such agreement for the benefit of the bankruptcy estate. The FDIC's repudiation of the Tax Sharing Agreement has caused the bankruptcy estate to incur damages as described below.

Under paragraph 5 of the Tax Sharing Agreement, Bancorp is authorized, among other things, to file a consolidated tax return and to file a claim for refund on behalf of, among other affiliated corporations, the Bank. Paragraph 5 further provides in relevant part:

In its sole discretion, [Bancorp] shall have the right with respect to any Consolidated Returns that it has filed or will file,

(a)     to determine

4

(i)     the manner in which such returns, documents or statements shall be prepared and filed, including, without limitation, the manner in which any item of income, gain, loss, deduction or credit shall be reported,

(ii)    whether any extension may be requested, and

(iii)   the election that will be made by the Bank.

(b)     to contest, compromise or settle any adjustment or deficiency proposed, asserted or assessed as a result of any audit of such returns by the IRS or a State Authority.

(c)     to file, prosecute, compromise or settle any claim for refund, and

(d)     to determine whether any refunds, to which the Group may be entitled, shall be paid by way of refund or credit against the tax liability of the Group. The Bank hereby appoints [Bancorp] as its agent and attorney-in-fact to take such action (including the execution of documents) as [Bancorp] may deem appropriate to effect the foregoing.

The FDIC filed a 2007 federal tax return on behalf of the Bank and its subsidiaries on or around September 15, 2008. Adhering to is obligations under the Tax Sharing Agreement, Bancorp filed a 2007 consolidated federal tax return on September 15, 2008. Under this 2007 consolidated tax return, a refund in the amount of $2,288,386 is due, as well as a refund of $11,520,072 as a result of carrying back losses to the 2005 and 2006 tax years. Such refunds should be made payable to Bancorp for subsequent disposition of the refunds in accordance with the Tax Sharing Agreement and applicable law. For example, under Treasury Regulation section 1.1502-77(a), Bancorp, as the common parent of the consolidated group that includes the Bank, generally has the authority to act as the sole agent for the subsidiary members of the group with respect to all matters relating to the tax liability of the consolidated group. Pursuant to this authority, Bancorp may file claims for refund, and any refund claimed in accordance with such authority should be paid directly to Bancorp. To the extent that it is determined that the Bank is entitled to any such refund, paragraph 3 of the Tax Sharing Agreement provides a specific mechanism by which Bancorp will pay the Bank its share of such refunds. Based upon its assessment of the Tax Sharing Agreement and applicable law, Bancorp may be entitled to some or all of the refunds.

In addition, paragraph 2 of the Tax Sharing Agreement provides that the Bank is obligated to pay Bancorp an amount equal to the Bank's separate tax liability[1] with respect to each tax year. Moreover, paragraph 4 of the Tax Sharing

---

[1]   The Tax Sharing Agreement defines "separate tax liability" as "the Federal, or State income tax liability of the Bank Group computed as if it had filed a separate

Agreement states that amounts due under the Tax Sharing Agreement "shall be redetermined by taking into account" adjustments as a result of, among other things, an audit by the Internal Revenue Service ("IRS") or a state authority. The IRS has filed a Proof of Claim in the Bankruptcy Case seeking $27,815,260.34 in unsecured priority claims and $42,752.12 in unsecured general claims with respect to unassessed tax liabilities stemming from 2004, 2006, 2007 and 2008 tax periods. Upon information and belief, the claimed unassessed tax liabilities from 2004, which amount to $21,592,094 of the unsecured priority claims, relate to the IRS' ongoing audit of certain aspects of the 2004 consolidated federal tax return. Accordingly, consistent with paragraph 4 of the Tax Sharing Agreement, to the extent such unassessed tax liabilities are based upon the Bank's separate tax liability, any amounts owed to the Bank from the refunds may be used to offset any amounts owed to the IRS stemming from the IRS' proof of claim filed in the Bankruptcy Case or any other claims that it may assert against Bancorp that are based upon the Bank's separate tax liability, as well as any other adjustments that Bancorp may determine need to be made "to the income, gains, losses, deductions or credits" with respect to other tax years for which Bancorp filed consolidated tax returns on behalf of the Bank.

Further, in addition to the federal tax refunds, Bancorp may be entitled to an undetermined amount due from state tax refunds. Accordingly, the Trustee believes that it is entitled to recover some or all of the $13,808,458 due federal tax refunds, undetermined amounts that may be due from state tax refunds, as well as undetermined amounts resulting from claims or demands for payment made against Bancorp that are based upon the Bank's separate tax liability including, but not limited to, claims made by the IRS.

The Trustee still is investigating the bankruptcy estate's claims resulting from the purported repudiation of the Tax Sharing Agreement, and hereby alleges general damages resulting therefrom which shall be in accordance with proof. The Trustee expressly reserves all rights under law in connection with matters that are the subject of the Tax Sharing Agreement, irrespective of any repudiation thereof.

Accordingly, without limiting the generality of the preceding, the Trustee is entitled to seek recovery of all of the assets transferred downstream when Bancorp and the Bank were, or were rendered, insolvent, undercapitalized, or unable to pay their debts as they became due, including but not limited to the transfers identified above: an undermined amount for those claims based upon breaches of fiduciary duties owed by the directors and officers of the Bank to Bancorp; an undetermined amount for those claims based upon payments made by or expenses

---

Federal or State income tax return for the applicable year. If the computation of the Bank Group's Separate Tax Liability as provided herein does not result in a positive amount, the Bank Group's Separate Tax Liability shall be zero."

charged to Bancorp that should have been paid by the Bank; an undetermined amount for claims with respect to the Bank assets that are property of the bankruptcy estate; as well as amounts related to claims stemming from tax-related issues, including those related to the FDIC's repudiation of the Tax Sharing Agreement and reserves all of its rights in connection therewith. Moreover, in light of the lack of access to books and records and personnel that are currently in the custody and control of the FDIC, we reserve our right to bring additional claims based upon information that the FDIC currently has not shared with us, and to amend this claim to conform to proof and to assert additional damages and liabilities.

1

## PROOF OF SERVICE

I declare that I am over eighteen years of age and that I am not a party to this action. My business address is 1999 Avenue of the Stars, Thirty-Ninth Floor, Los Angeles, California 90067-6049.

On October 13, 2008, I served a true and correct copy of the following document on the party indicated below by using the method indicated below:

**PROOF OF CLAIM [REGARDING FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR INDYMAC BANK, F.S.B.].**

☒ **By United Parcel Service:** I placed the foregoing document into an envelope addressed as follows, sealed the envelope, and delivered the envelope to United Parcel Service at Los Angeles, California, on October 13, 2008, for overnight delivery, along with the necessary billing information to ensure timely delivery of the envelope:

Federal Deposit Insurance Corporation
as Receiver for IndyMac Bank, F.S.B.
Attn: Claims Agent
1601 Bryan St.
Dallas, Texas 75201

I declare that I am employed in the office of a member of the bar of the State of California at whose direction the service was made and that this declaration was executed at Los Angeles, California on October 13, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Rosalind A. Williams

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 AVENUE OF THE STARS, 39TH FLOOR
LOS ANGELES, CALIFORNIA 90067-6049
TELEPHONE: (310) 407-4000

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit B

09 1088

**FILED**

JUN 1 2 2009

**Clerk, U.S. District and
Bankruptcy Courts**



**FDIC**

**Federal Deposit Insurance Corporation**
1601 Bryan Street, Dallas, TX 75201                                    Division of Resolutions and Receiverships

CERTIFIED MAIL
RETURN RECEIPT REQUESTED – 7008 1830 0000 8035 7224

April 13, 2009

IndyMac Bancorp, Inc.
C/O Ben Klubes
15233 Ventura Blvd, 9th Floor
Sherman Oaks, CA 91403-2201

SUBJECT:     10007– IndyMac Bank, F.S.B.
             Pasadena, CA – In Receivership
             **NOTICE OF DISALLOWANCE OF CLAIM**

Dear Claimant:

The Receiver of IndyMac Bank, F.S.B. has reviewed your claim against the receivership. After a thorough review of your filed claim along with your supporting documentation, the Receiver has determined to disallow your claim for the following reason(s):

> The facts and amount of damages, if any, are in dispute and therefore were not fixed and certain as of bank failure on July 11, 2008.

Pursuant to 12 U.S.C. Section 1821 (d) (6), if you do not agree with this disallowance, you have the right to file a lawsuit on your claim (or continue any lawsuit commenced before the appointment of the Receiver), in the United States District (or Territorial) Court for the District within which the failed institution's principal place of business was located or the United States District Court for the District of Columbia within 60 days from the date of this notice.

**IF YOU DO NOT FILE A LAWSUIT (or continue any lawsuit commenced before the appointment of the Receiver) BEFORE THE END OF THE 60-DAY PERIOD, THE DISALLOWANCE WILL BE FINAL, YOUR CLAIM WILL BE FOREVER BARRED AND YOU WILL HAVE NO FURTHER RIGHTS OR REMEDIES WITH RESPECT TO YOUR CLAIM. 12 U.S.C. Section 1821(d)(6)(B).**

However, if a portion of your claim is for an insured deposit, your claim is not against the Receiver but rather is against the FDIC in its "corporate" (or Territorial) capacity as deposit insurer. An insured depositor's rights are prescribed in 12 U.S.C. Section 1821(f) and differ from the rights described in the preceding paragraphs.

If you have any questions about this letter, please contact the undersigned at (972) 761-2665.

Sincerely,

Jeffry M. Quick
Claims Agent
Claims Department

RLS7218